In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 16-3522

ASHTON WHITAKER, BY HIS MOTHER AND NEXT FRIEND MELISSA WHITAKER,

*Plaintiff-Appellee,*

*v.*

KENOSHA UNIFIED SCHOOL DISTRICT NO. 1 BOARD OF EDUCATION, et al.,

*Defendants-Appellants*

———————————

Appeal from the United States District Court for the Eastern District of Wisconsin.
No. 2:16-cv-00943-PP — **Pamela Pepper**, *Judge.*

———————————

ARGUED MARCH 29, 2017 — DECIDED MAY 30, 2017

———————————

Before WOOD, *Chief Judge*, and ROVNER and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Ashton ("Ash") Whitaker is a 17 year-old high school senior who has what would seem like a simple request: to use the boys' restroom while at school.

However, the Defendants, the Kenosha Unified School District and its superintendent, Sue Savaglio, (the "School District") believe that the request is not so simple because Ash[1] is a transgender boy. The School District did not permit Ash to enter the boys' restroom because, it believed, that his mere presence would invade the privacy rights of his male classmates. Ash brought suit, alleging that the School District's unwritten bathroom policy[2] violates Title IX of the Education Amendments Act of 1972 and the Fourteenth Amendment's Equal Protection Clause.

In addition to filing suit, Ash, beginning his senior year, moved for preliminary injunctive relief, seeking an order granting him access to the boys' restrooms. He asserted that the denial of access to the boys' bathroom was causing him harm, as his attempts to avoid using the bathroom exacerbated his vasovagal syncope, a condition that renders Ash susceptible to fainting and/or seizures if dehydrated. He also contended that the denial caused him educational and emotional harm, including suicidal ideations. The School District vigorously objected and moved to dismiss Ash's claims, arguing that Ash could neither state a claim under Title IX nor the Equal Protection Clause. The district court denied the motion to dismiss and granted Ash's preliminary injunction motion.

On appeal, the School District argues that we should exercise pendent appellate jurisdiction to review the district

---

[1] We will refer to the Plaintiff-Appellee as "Ash," rather than by his last name, as this is how he refers to himself throughout his brief.

[2] We will refer to the School District's decision to deny Ash access to the boys' restroom as a "policy," although any such "policy" is unwritten and its exact boundaries are unclear.

court's decision to deny the motion to dismiss. However, we decline this invitation, as the two orders were not inextricably intertwined and we can review the grant of the preliminary injunction without reviewing the denial of the motion to dismiss.

The School District also argues that we should reverse the district court's decision to grant the preliminary injunction for two main reasons. First, it argues that the district court erred in finding that Ash had demonstrated a likelihood of success on the merits because transgender status is neither a protected class under Title IX nor is it entitled to heightened scrutiny. And, because the School District's policy has a rational basis, that is, the need to protect other students' privacy, Ash's claims fail as a matter of law. We reject these arguments because Ash has sufficiently demonstrated a likelihood of success on his Title IX claim under a sex-stereotyping theory. Further, because the policy's classification is based upon sex, he has also demonstrated that heightened scrutiny, and not rational basis, should apply to his Equal Protection Claim. The School District has not provided a genuine and exceedingly persuasive justification for the classification.

Second, the School District argues that the district court erred in finding that the harms to Ash outweighed the harms to the student population and their privacy interests. We disagree. The School District has failed to provide any evidence of how the preliminary injunction will harm it, or any of its students or parents. The harms identified by the School District are all speculative and based upon conjecture, whereas the harms to Ash are well-documented and supported by the record. As a consequence, we affirm the grant of preliminary injunctive relief.

## I. BACKGROUND

Ash Whitaker is a 17 year-old who lives in Kenosha, Wisconsin with his mother, who brought this suit as his "next friend."[3] He is currently a senior at George Nelson Tremper High School, which is in the Kenosha Unified School District. He entered his senior year ranked within the top five percent of his class and is involved in a number of extracurricular activities including the orchestra, theater, tennis, the National Honor Society, and the Astronomical Society. When not in os-chool or participating in these activities, Ash works part-time as an accounting assistant in a medical office.

While Ash's birth certificate designates him as "female," he does not identify as one. Rather, in the spring of 2013, when Ash was in eighth grade, he told his parents that he is transgender and a boy. He began to openly identify as a boy during the 2013-2014 school year, when he entered Tremper as a freshman. He cut his hair, began to wear more masculine clothing, and began to use the name Ashton and male pronouns. In the fall of 2014, the beginning of his sophomore year, he told his teachers and his classmates that he is a boy and asked them to refer to him as Ashton or Ash and to use male pronouns.

In addition to publicly transitioning, Ash began to see a therapist, who diagnosed him with Gender Dysphoria, which the American Psychiatric Association defines as "a marked incongruence between one's experienced/expressed gender

---

[3] Because Ash is a minor without a duly appointed representative, pursuant to Rule 17 of the Federal Rules of Civil Procedure, he may assert these claims only through a "next friend" or guardian ad litem.

and assigned gender … ."[4] *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 452 (5th ed. 2013). In July 2016, under the supervision of an endocrinologist at Children's Hospital of Wisconsin, Ash began hormone replacement therapy. A month later, he filed a petition to legally change his name to Ashton Whitaker, which was granted in September 2016.

For the most part, Ash's transition has been met without hostility and has been accepted by much of the Tremper community. At an orchestra performance in January 2015, for example, he wore a tuxedo like the rest of the boys in the group. His orchestra teacher, classmates, and the audience accepted this without incident. Unfortunately, the School District has not been as accepting of Ash's requests to use the boys' restrooms.

In the spring of his sophomore year, Ash and his mother met with his guidance counselor on several occasions to request that Ash be permitted to use the boys' restrooms while at school and at school-sponsored events. Ash was later notified that the administration had decided that he could only use the girls' restrooms or a gender-neutral restroom that was in the school's main office, which was quite a distance from his classrooms. Because Ash had publicly transitioned, he believed that using the girls' restrooms would undermine his transition. Additionally, since Ash was the only student who was permitted to use the gender-neutral bathroom in the school's office, he feared that using it would draw further attention to his transition and status as a transgender student at

---

[4] We take judicial notice of the Diagnostic and Statistical Manual pursuant to Rule 201 of the Federal Rules of Evidence.

Tremper. As a high schooler, Ash also worried that he might be disciplined if he tried to use the boys' restrooms and that such discipline might hurt his chances of getting into college. For these reasons, Ash restricted his water intake and attempted to avoid using any restroom at school for the rest of the school year.

Restricting his water intake was problematic for Ash, who has been diagnosed with vasovagal syncope. This condition renders Ash more susceptible to fainting and/or seizures if dehydrated. To avoid triggering the condition, Ash's physicians have advised him to drink six to seven bottles of water and a bottle of Gatorade daily. Because Ash restricted his water intake to ensure that he did not have to utilize the restroom at school, he suffered from symptoms of his vasovagal syncope, including fainting and dizziness. He also suffered from stress-related migraines, depression, and anxiety because of the policy's impact on his transition and what he perceived to be the impossible choice between living as a boy or using the restroom. He even began to contemplate suicide.

In the fall of 2015, Ash began his junior year at Tremper. For six months, he exclusively used the boys' restrooms at school without incident. But, in February 2016, a teacher saw him washing his hands at a sink in the boys' restroom and reported it to the school's administration. In response, Ash's guidance counselor, Debra Tronvig, again told Ash's mother that he was permitted to only use the girls' restrooms or the gender-neutral bathroom in the school's main office. The next month, Ash and his mother met with Assistant Principal Holly Graf to discuss the school's policy. Like before, Ms. Graf stated that Ash was not permitted to use the boys' restrooms. However, the reason she gave this time was that he was listed

as a female in the school's official records and to change those records, the school needed unspecified "legal or medical documentation."

Two letters submitted by Ash's pediatrician, identifying him as a transgender boy and recommending that he be allowed to use male-designated facilities at school were deemed not sufficient to change his designation. Rather, the school maintained that Ash would have to complete a surgical transition … a procedure that is prohibited for someone under 18 years of age … to be permitted access to the boys' restroom. Further, not all transgender persons opt to complete a surgical transition, preferring to forgo the significant risks and costs that accompany such procedures. The School District did not give any explanation as to why a surgical transition was necessary. Indeed, the verbal statements made to Ash's mom about the policy have never been reduced to writing. In fact, the School District has *never* provided any written document that details when the policy went into effect, what the policy is, or how one can change his status under the policy.

Fearing that using the one gender-neutral restroom would single him out and subject him to scrutiny from his classmates and knowing that using the girls' restroom would be in contradiction to his transition, Ash continued to use the boys' restroom for the remainder of his junior year.

This decision was not without a cost. Ash experienced feelings of anxiousness and depression. He once more began to contemplate suicide. Nonetheless, the school's security guards were instructed to monitor's Ash's restroom use to ensure that he used the proper facilities. Because Ash continued

to use the boys' restroom, he was removed from class on several occasions to discuss his violation of the school's unwritten policy. His classmates and teachers often asked him about these meetings and why administrators were removing him from class.

In April 2016, the School District provided Ash with the additional option of using two single-user, gender-neutral restrooms. These locked restrooms were on the opposite side of campus from where his classes were held. The School District provided only one student with the key: Ash. Since the restrooms were not near his classrooms, which caused Ash to miss class time, and because using them further stigmatized him, Ash again avoided using the bathrooms while at school. This only exacerbated his syncope and migraines. In addition, Ash began to fear for his safety as more attention was drawn to his restroom use and transgender status.

Although not part of this appeal, Ash contends that he has also been subjected to other negative actions by the School District, including initially prohibiting him from running for prom king, referring to him with female pronouns, using his birth name, and requiring him to room with female students or alone on school-sponsored trips. Furthermore, Ash learned in May 2016 that school administrators had considered instructing its guidance counselors to distribute bright green wristbands to Ash and other transgender students so that their bathroom usage could be monitored more easily. Throughout this litigation, the School District has denied that it considered implementing the wristband plan.

### A. Proceedings Below

In the spring of 2016, Ash engaged counsel who, in April 2016, sent the School District a letter demanding that it permit him to use the boys' restroom while at school and during school-sponsored events. In response, the School District repeated its policy that Ash was required to use either the girls' restroom or the gender-neutral facilities. On May 12, 2016, Ash filed an administrative complaint with the United States Department of Education's Office for Civil Rights, alleging that this policy violated his rights under Title IX. To pursue the instant litigation, Ash chose to withdraw the complaint without prejudice.

On July 16, 2016, Ash commenced this action and on August 15, he filed an Amended Complaint alleging that the treatment he received at Tremper High School violated Title IX, 20 U.S.C. §1681, *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment. That same day, Ash, in a motion for preliminary injunction, sought to enjoin the enforcement of the School District's policy pending the outcome of the litigation. The next day, the School District filed a motion to dismiss and filed its opposition to the preliminary injunction shortly thereafter.

After a hearing on the motion to dismiss, the district court denied the motion. The next day, it heard oral arguments on Ash's motion for preliminary injunction. A few days later, the district court granted the motion in part and enjoined the School District from: (1) denying Ash access to the boys' restroom; (2) enforcing any written or unwritten policy against Ash that would prevent him from using the boys' restroom while on school property or attending school-sponsored events; (3) disciplining Ash for using the boys' restroom while

on school property or attending school-sponsored events; and (4) monitoring or surveilling Ash's restroom use in any way. This appeal followed.

In a separate appeal, the School District petitioned this court for permission to file an interlocutory appeal of the district court's denial of its motion to dismiss. Although initially the district court certified the order denying the motion to dismiss for immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b), it revoked that certification when it concluded that it had erred by including the certification language in its initial order. Therefore, we denied the School District's petition for interlocutory review of the motion to dismiss for lack of jurisdiction. *See Kenosha Unified Sch. Dist. No. 1 Bd. of Educ. v. Whitaker*, 841 F.3d 730, 731–32 (7th Cir. 2016). In the alternative, the School District urged this court to exercise pendent jurisdiction over the order denying the motion to dismiss because the district court had partially granted the preliminary injunction. But since we lacked jurisdiction to consider the petition for interlocutory appeal, we also lacked a proper jurisdictional basis for extending pendent jurisdiction. *Id.* at 732. Therefore, in this appeal, the School District was directed to seek pendent appellate jurisdiction, which it has now done.

## II. ANALYSIS

The School District raises two issues on appeal. First, that this court should assert pendent jurisdiction over the district court's decision to deny its motion to dismiss and second, that the district court erred in granting Ash's motion for preliminary injunction. We will address each issue in turn.

### A. Pendent Jurisdiction Is Not Appropriate

Ordinarily, an order denying a motion to dismiss is not a final judgment and is not appealable. *See* 28 U.S.C. § 1291 (providing federal appellate courts with jurisdiction over appeals from all final decisions). But, the School District again urges us to assert pendent appellate jurisdiction to consider the denial of the motion to dismiss. We decline the invitation.

Pendent appellate jurisdiction is a discretionary doctrine. *Jones v. InfoCure Corp.*, 310 F.3d 529, 537 (7th Cir. 2002). It is also a narrow one, *Abelesz v. OTP Bank*, 692 F.3d 638, 647 (7th Cir. 2012), which the Supreme Court sharply restricted in *Swint v. Chambers County Commission*, 514 U.S. 35 (1995). After *Swint*, we noted in *United States v. Board of School Commissioners of the City of Indianapolis*, 128 F.3d 507 (7th Cir. 1997), that pendent appellate jurisdiction is a "controversial and embattled doctrine." *Id*. at 510. Nonetheless, the Supreme Court recognized a narrow path for its use in *Clinton v. Jones*, 520 U.S. 681, 707 n.41 (1997), where it found that a collateral order denying presidential immunity was inextricably intertwined with an order that stayed discovery and postponed trial, and was therefore, reviewable on appeal.

When applicable, the doctrine allows for review of an "otherwise unappealable interlocutory order if it is inextricably intertwined with an appealable one." *Montano v. City of Chicago*, 375 F.3d 593, 599 (7th Cir. 2004) (quoting *Jones*, 310 F.3d at 536) (internal quotation marks omitted). This requires more than a "close link" between the two orders. *Id*. at 600. Judicial economy is also an insufficient justification for invoking the doctrine and disregarding the final-judgment rule. *McCarter v. Ret. Plan for Dist. Managers of Am. Family Ins. Grp.*,

540 F.3d 649, 653 (7th Cir. 2008). Rather, we must satisfy ourselves that based upon the specific facts of this case, it is "practically indispensable that we address the merits of the unappealable order in order to resolve the properly-taken appeal." *Montano*, 375 F.3d at 600 (quoting *United States ex rel. Valders Stone & Marble, Inc. v. C-Way Constr. Co.*, 909 F.2d 259, 262 (7th Cir. 1990)) (internal quotation marks omitted); *see also Abelesz*, 692 F.3d at 647 ("[P]endent appellate jurisdiction should not be stretched to appeal normally unappealable interlocutory orders that happen to be related—even closely related—to the appealable order."). Such a high threshold is required because a more relaxed approach would allow the doctrine to swallow the final-judgment rule. *Montano*, 375 F.3d at 599 (citing *Patterson v. Portch*, 853 F.2d 1399, 1403 (7th Cir. 1988)).

As we discuss below, the district court determined that Ash sufficiently demonstrated a likelihood of success on the merits of his claims and that preliminary injunctive relief was warranted. In doing so, the district court referenced its decision to deny the School District's motion to dismiss. The School District contends that this rendered the two decisions inextricably intertwined. Therefore, it reasons that pendent jurisdiction is appropriate because to engage in a meaningful review of the preliminary injunction order, the court must also review the denial of the motion to dismiss.

Merely referencing the earlier decision to deny the motion to dismiss, however, did not inextricably intertwine the two orders. Certainly the legal issues raised in the motions overlapped, as both motions challenged, in different ways and under different standards, the likely merits of Ash's claim. Invoking pendent jurisdiction simply because of this overlap would essentially convert a motion for preliminary injunctive

relief into a motion to dismiss, which would raise the threshold showing a plaintiff must make before receiving injunctive relief. For all practical purposes, this would mean that every time a motion to dismiss is filed simultaneously with a motion for preliminary injunction, this doctrine would apply. This makes no sense and we do not see a compelling reason for invoking the doctrine here.

## B. Preliminary Injunctive Relief Was Proper

A preliminary injunction is an extraordinary remedy. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (noting that "a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.") (internal quotation marks and citation omitted). It is never awarded as a matter of right. *D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016). We review the grant of a preliminary injunction for the abuse of discretion, reviewing legal issues *de novo*, *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1057 (7th Cir. 2016), while factual findings are reviewed for clear error. *Fed. Trade Comm'n v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016). Substantial deference is given to the district court's "weighing of evidence and balancing of the various equitable factors." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).

A two-step inquiry applies when determining whether such relief is required. *Id.* at 661. First, the party seeking the preliminary injunction has the burden of making a threshold showing: (1) that he will suffer irreparable harm absent preliminary injunctive relief during the pendency of his action; (2) inadequate remedies at law exist; and (3) he has a reasonable likelihood of success on the merits. *Id.* at 661–62. If the

movant successfully makes this showing, the court must en-
gage in a balancing analysis, to determine whether the bal-
ance of harm favors the moving party or whether the harm to
other parties or the public sufficiently outweighs the mo-
vant's interests. *Jones*, 842 F.3d at 1058.

### 1.  Ash Likely to Suffer Irreparable Harm

The moving party must demonstrate that he will likely
suffer irreparable harm absent obtaining preliminary injunc-
tive relief. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d
765, 787 (7th Cir. 2011). This requires more than a mere possi-
bility of harm. *Id.* at 788. It does not, however, require that the
harm actually occur before injunctive relief is warranted. *Id.*
Nor does it require that the harm be certain to occur before a
court may grant relief on the merits. *Id.* Rather, harm is con-
sidered irreparable if it "cannot be prevented or fully rectified
by the final judgment after trial." *Girl Scouts of Manitou Coun-
cil, Inc.*, 549 F.3d at 1089 (quoting *Roland Mach. Co. v. Dresser
Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)) (internal quota-
tion marks omitted). Because a district court's determination
regarding irreparable harm is a factual finding, it is reviewed
for clear error. *Id.* at 1087.

On appeal, the School District argues that the district court
erred in finding that Ash established that he would suffer ir-
reparable harm absent a preliminary injunction. Although
Ash proffered reports from two different experts regarding
the harm caused to him by the School District's policy, the
School District contends that neither expert was able to actu-
ally quantify this harm. Further, the School District notes that
Ash's failure to take advantage of "readily available alterna-
tives," namely the gender-neutral bathrooms, undermines his
claim of irreparable harm. Lastly, the School District points to

Ash's delay in seeking injunctive relief as indicative of the lack of irreparable harm.

The School District's arguments miss the point. The district court was presented with expert opinions that supported Ash's assertion that he would suffer irreparable harm absent preliminary relief. These experts opined that use of the boys' restrooms is integral to Ash's transition and emotional well-being. Dr. Stephanie Budge, a psychologist who specializes in working with adolescents and adults who have Gender Dysphoria, met with Ash and his mother, and in her report noted that the treatment Ash faced at school "significantly and negatively impacted his mental health and overall well-being."

Dr. Budge also noted that Ash reported current thoughts of suicide and that his depression worsened each time he had to meet with school officials regarding his bathroom usage. Ultimately, she opined that the School District's actions, including its bathroom policy, which identified Ash as transgender and therefore, "different," were "directly causing significant psychological distress and place [Ash] at risk for experiencing life-long diminished well-being and life-functioning." The district court did not clearly err in relying upon these findings when it concluded that Ash would suffer irreparable harm absent preliminary injunctive relief.

Further, the School District's argument that Ash's harm was self-inflicted because he chose not to use the gender-neutral restrooms, fails to comprehend the harm that Ash has identified. The School District actually exacerbated the harm, when it dismissed him to a separate bathroom where he was the only student who had access. This action further stigmatized Ash, indicating that he was "different" because he was a transgender boy.

Moreover, the record demonstrates that these bathrooms were not located close to Ash's classrooms. Therefore, he was faced with the unenviable choice between using a bathroom that would further stigmatize him and cause him to miss class time, or avoid use of the bathroom altogether at the expense of his health.

Additionally, Ash alleged that using the single-user restrooms actually invited more scrutiny and attention from his peers, who inquired why he had access to these restrooms and asked intrusive questions about his transition. This further intensified his depression and anxiety surrounding the School District's policy. Therefore, it cannot be said that the harm was "self-inflicted."

Finally, Ash did not delay in seeking injunctive relief. He had used the boys' bathroom for months without incident, and he filed an administrative complaint with the Department of Education in April 2016, just weeks after the school began to enforce its policy once more. He made the decision to withdraw that complaint over the summer and commence the instant litigation instead so that he could pursue injunctive relief prior to beginning his senior year. It is important to note that Ash was on summer break and not subject to the School District's bathroom policy at the time he chose to pursue the litigation. Therefore, Ash's decision to seek injunctive relief over the summer rather than initiate an administrative complaint does not undermine his argument that the policy was inflicting, and would continue to inflict, irreparable harm.

## 2. No Adequate Remedies at Law

The moving party must also demonstrate that he has no adequate remedy at law should the preliminary injunction not issue. *Protamek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002). This does not require that he demonstrate that the remedy be wholly ineffectual. *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). Rather, he must demonstrate that any award would be "seriously deficient as compared to the harm suffered." *Id.*

While the School District focuses the majority of its arguments on why Ash's harm is not irreparable, it also argues that any harm he has allegedly suffered can be remedied by monetary damages. We are not convinced. While monetary damages are used to compensate plaintiffs in tort actions, in those situations the damages relate to a past event, where the harm was inflicted on the plaintiff through negligence or something comparable. But this case is not the typical tort action, as Ash has alleged *prospective* harm. He has asserted that the policy caused him to contemplate suicide, a claim that was credited by the expert report of Dr. Budge. We cannot say that this potential harm—his suicide—can be compensated by monetary damages. Nor is there an adequate remedy for preventable "life-long diminished well-being and life-functioning." Therefore, we reject the School District's analogy to tort damages and find that Ash adequately established that there was no adequate remedy of law available.

## 3. Likelihood of Success on Merits

A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, he must only show that his chances to succeed on his

claims are "better than negligible." *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). This is a low threshold. *U.S. Army Corps of Eng'rs*, 667 F.3d at 782. Ash's Amended Complaint contains two claims—one pursuant to Title IX and the other pursuant to the Equal Protection Clause of the Fourteenth Amendment. We will discuss each claim in turn.

### i.  Title IX Claim

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance … ." 20 U.S.C. § 1681(a); *see also* 34 C.F.R. § 106.31(a). Covered institutions are, therefore, among other things, prohibited from: (1) providing different aid, benefits, or services; (2) denying aid, benefits, or services; and (3) subjecting any person to separate or different rules, sanctions, or treatment on the basis of sex. *See* 34 C.F.R. § 106.31(b)(2)–(4). Pursuant to the statute's regulations, an institution may provide separate, but comparable, bathroom, shower, and locker facilities. *Id*. § 106.33. The parties agree that the School District receives federal funds and is a covered institution.

The parties' dispute focuses on the coverage of Title IX and whether under the statute, a transgender student who alleges discrimination on the basis of his or her transgender status can state a claim of sex discrimination. Neither the statute nor the regulations define the term "sex." Also absent from the statute is the term "biological," which the School District maintains is a necessary modifier. Therefore, we turn to the Supreme Court and our case law for guidance.

First, under our own case law, we do not see a barrier to Ash's Title IX claim. Although not as often as some of our sister circuits, this court has looked to Title VII when construing Title IX. *See e.g.*, *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1023 (7th Cir. 1997) (noting that "it is helpful to look to Title VII to determine whether the alleged sexual harassment is severe and pervasive enough to constitute illegal discrimination on the basis of sex for purposes of Title IX."). The School District contends that we should do so here, and relies on our reasoning in *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984), to conclude that Ash cannot state a claim under Title IX as a matter of law. Other courts have agreed with the School District's position. *See Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1221 (10th Cir. 2007) (relying upon *Ulane* to find that transsexuals are not a protected class under Title VII); *Johnston v. Univ. of Pittsburgh of Commw. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 675–76 (W.D. Pa. 2015) (relying upon *Ulane* to find that a transgender student cannot state a claim under Title IX). We disagree.

In *Ulane*, we noted in dicta that Title VII's prohibition on sex discrimination "implies that it is unlawful to discriminate against women because they are women and against men because they are men." 742 F.2d at 1085. We then looked to the lack of legislative history regarding the meaning of the term "sex" in Title VII and concluded that this prohibition should be "given a narrow, traditional interpretation, which would also exclude transsexuals." *Id.* at 1085–86. This reasoning, however, cannot and does not foreclose Ash and other transgender students from bringing sex-discrimination claims based upon a theory of sex-stereotyping as articulated four years later by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

In *Price Waterhouse*, a plurality of the Supreme Court and two justices concurring in the judgment, found that the plaintiff had adequately alleged that her employer, in violation of Title VII, had discriminated against her for being too masculine. The plurality further emphasized that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group." *Id.* at 251. Thus, the Court embraced a broad view of Title VII, as Congress "intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Id.; see also Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir. 1971) ("In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.").

The Supreme Court further embraced an expansive view of Title VII in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998), where Justice Scalia, writing for a unanimous Court, declared that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Id.* at 79.

Following *Price Waterhouse*, this court and others have recognized a cause of action under Title VII when an adverse action is taken because of an employee's failure to conform to sex stereotypes. *See, e.g., Doe v. City of Belleville*, 119 F.3d 563, 580–81 (7th Cir. 1997), *vacated on other grounds*, 523 U.S. 1001 (1998); *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017); *Bibby v. Phila. Coca-Cola Bottling Co.*, 260 F.3d 257,

263-64 (3d Cir. 2001); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 874–75 (9th Cir. 2001); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 n.4 (1st Cir. 1999). Our most recent application occurred when, sitting *en banc*, we held that a homosexual plaintiff can state a Title VII claim of sex discrimination based upon a theory of sex-stereotyping. *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 351–52 (7th Cir. 2017) (holding that a homosexual plaintiff may state a claim for sex-based discrimination under Title VII under either a sex stereotyping theory or under the associational theory).

The School District argues that even under a sex-stereotyping theory, Ash cannot demonstrate a likelihood of success on his Title IX claim because its policy is not based on whether the student behaves, walks, talks, or dresses in a manner that is inconsistent with any preconceived notions of sex stereotypes. Instead, it contends that as a matter of law, requiring a biological female to use the women's bathroom is not sex-stereotyping. However, this view is too narrow.

By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth. We are not alone in this belief. *See Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011). In *Glenn*, the Eleventh Circuit noted that "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes." *Id.* at 1316. The Eleventh Circuit reiterated this conclusion in a *per curiam* unpublished opinion, noting that "sex discrimination includes discrimination against a transgender person for gender nonconformity." *Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883, 884 (11th Cir. 2016) (unpub.).

The Sixth Circuit has also recognized a transgender plaintiff's ability to bring a sex-stereotyping claim. In *Smith v. City of Salem* 378 F.3d 566 (6th Cir. 2004), the plaintiff was diagnosed with Gender Identity Disorder, a condition later renamed Gender Dysphoria. Born a male, the plaintiff began to present at work with a more feminine appearance and mannerisms. He[5] alleged in his complaint that as a result, his employer schemed to take action against him and ultimately subjected him to a pretextual suspension in violation of Title VII. While the district court concluded that because the plaintiff was transsexual he was not entitled to Title VII's protections, the Sixth Circuit disagreed.

Instead, the Sixth Circuit noted that *Price Waterhouse* established that the prohibition on sex discrimination "encompasses both the biological differences between men and women, and gender discrimination, that is, discrimination based on a failure to conform to stereotypical gender norms." *Id*. at 573 (citing *Price Waterhouse*, 490 U.S. at 251). If Title VII prohibits an employer from discriminating against a woman for dressing too masculine, then, the court reasoned, Title VII likewise prohibits an employer from discriminating against a man who dresses in a way that it perceives as too feminine. In both examples the discrimination would not occur but for the victim's sex, in violation of Title VII. *Id.* at 574. Therefore, the plaintiff's status as transsexual was not a bar to his claim.

Several district courts have adopted this reasoning, finding that a transgender plaintiff can state a claim under Title

---

[5] We will use the masculine pronoun to refer to the *Smith* plaintiff for the purpose of clarity, as this is how the Sixth Circuit referred to the *Smith* plaintiff throughout its opinion.

VII for sex discrimination on the basis of a sex-stereotyping theory. *See Valentine Ge v. Dun & Bradstreet, Inc.*, No. 6:15-CV-1029-ORL-41GJK, 2017 WL 347582, at *4 (M.D. Fla. Jan. 24, 2017); *Roberts v. Clark Cty. Sch. Dist.*, 215 F. Supp. 3d 1001, 1014 (D. Nev. 2016), *reconsideration denied*, No. 2:15-CV-00388-JAD-PAL, 2016 WL 6986346 (D. Nev. Nov. 28, 2016); *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016); *E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, 100 F. Supp. 3d 594, 603 (E.D. Mich. 2015); *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F. Supp. 2d 653, 660 (S.D. Tex. 2008); *Schroer v. Billington*, 577 F. Supp. 2d 293, 305 (D.D.C. 2008). Further, courts have applied *Price Waterhouse* and found that transgender plaintiffs can state claims based upon a sex-stereotyping theory under the Gender Motivated Violence Act, *Schwenk v. Hartford*, 204 F.3d 1187, 1200 (9th Cir. 2000), and the Equal Credit Opportunity Act, *Rosa v. Park W. Bank & Trust Co.* 214 F.3d 213, 215–16 (1st Cir. 2000).

Here, however, the School District argues that this reasoning flies in the face of Title IX, as Congress has not explicitly added transgender status as a protected characteristic to either Title VII or Title IX, despite having opportunities to do so. *See e.g.*, Student Non-Discrimination Act of 2015 S. 439 114th Cong. (2015). The Supreme Court has rejected this argument, stating that congressional inaction "lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *Pension Benefit. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quoting *United States v. Wise*, 370 U.S. 405, 411 (1962)) (internal quotation marks omitted); *see also Hively*, 853 F.3d at 344 ("[I]t is simply too difficult to draw a reliable inference from these truncated legislative initiatives to rest our opinion

on them."). Therefore, Congressional inaction is not determinative.

Rather, Ash can demonstrate a likelihood of success on the merits of his claim because he has alleged that the School District has denied him access to the boys' restroom because he is transgender. A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX. The School District's policy also subjects Ash, as a transgender student, to different rules, sanctions, and treatment than non-transgender students, in violation of Title IX. Providing a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates the Act. Further, based on the record here, these gender-neutral alternatives were not true alternatives because of their distant location to Ash's classrooms and the increased stigmatization they caused Ash. Rather, the School District only continued to treat Ash differently when it provided him with access to these gender-neutral bathrooms because he was the only student given access.

And, while the School District repeatedly asserts that Ash may not "unilaterally declare" his gender, this argument misrepresents Ash's claims and dismisses his transgender status. This is not a case where a student has merely announced that he is a different gender. Rather, Ash has a medically diagnosed and documented condition. Since his diagnosis, he has consistently lived in accordance with his gender identity. This law suit demonstrates that the decision to do so was not without cost or pain. Therefore, we find that Ash has sufficiently

established a probability of success on the merits of his Title IX claim.

### ii. Equal Protection Claim

Although we are mindful of our duty to avoid rendering unnecessary constitutional decisions, *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001), *as amended* (July 2, 2001), we will address Ash's Equal Protection claim as the district court determined that Ash also demonstrated an adequate probability of success on the claim to justify the preliminary injunction. The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). It therefore, protects against intentional and arbitrary discrimination. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Generally, state action is presumed to be lawful and will be upheld if the classification drawn by the statute is rationally related to a legitimate state interest. *City of Cleburne*, 473 U.S. at 440.

The rational basis test, however, does not apply when a classification is based upon sex. Rather, a sex-based classification is subject to heightened scrutiny, as sex "frequently bears no relation to the ability to perform or contribute to society." *Id.* at 440–41 (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973)) (internal quotation marks omitted); *see also J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 135 (1994). When a sex-based classification is used, the burden rests with the state to demonstrate that its proffered justification is "exceedingly persuasive." *United States v. Virginia*, 518 U.S. 515, 533 (1996); *see also Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743

F.3d 569, 577 (7th Cir. 2014). This requires the state to show that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 524 (internal quotation marks omitted). It is not sufficient to provide a hypothesized or *post hoc* justification created in response to litigation. *Id.* at 533. Nor may the justification be based upon overbroad generalizations about sex. *Id.* Instead, the justification must be genuine. *Id.*

If a state actor cannot defend a sex-based classification by relying upon overbroad generalizations, it follows that sex-based stereotypes are also insufficient to sustain a classification. *See J.E.B.*, 511 U.S. at 138 (rejecting the state's reliance on sex-based stereotypes as a defense to the discriminatory use of peremptory challenges during jury selection); *see Glenn v. Brumby*, 663 F.3d 1312, 1318 (11th Cir. 2011) ("All persons, whether transgender or not, are protected from discrimination on the basis of gender stereotype.").

As a threshold matter, we must determine what standard of review applies to Ash's claim. The School District urges us to apply the rational basis test, arguing that transgender status is not a suspect class. Applying that test, the School District contends that its policy is presumptively constitutional and that requiring students to use facilities corresponding to their birth sex to protect the privacy of all students is a rational basis for its policy. So, the School District maintains that Ash cannot demonstrate a likelihood of success on his Equal Protection Claim.

Ash disagrees. He argues that transgender status should be entitled to heightened scrutiny in its own right, as transgender people are a minority who have historically been

subjected to discrimination based upon the immutable characteristics of their gender identities. Alternatively, he argues that even if transgender status is not afforded heightened scrutiny in its own right, the School District's bathroom policy creates a sex-based classification such that heightened scrutiny should apply.

There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity. According to a report issued by the National Center for Transgender Equality, 78% of students who identify as transgender or as gender non-conformant, report being harassed while in grades K-12. *See* Jaime M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, Nat'l Center for Transgender Equality, at 33 (2011), *available at* http://www.transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf. These same individuals in K-12 also reported an alarming rate of assault, with 35% reporting physical assault and 12% reporting sexual assault. *Id.* As a result, 15% of transgender and gender non-conformant students surveyed made the decision to drop out. *Id.* These statistics are alarming. But this case does not require us to reach the question of whether transgender status is per se entitled to heightened scrutiny. It is enough to stay that, just as in *Price Waterhouse*, the record for the preliminary injunction shows sex stereotyping. We note as well that there is no requirement that every girl, or every boy, be subjected to the same stereotyping. It is enough that Ash has experienced this form of sex discrimination.

Here, the School District's policy cannot be stated without referencing sex, as the School District decides which bath-

room a student may use based upon the sex listed on the student's birth certificate. This policy is inherently based upon a sex-classification and heightened review applies. Further, the School District argues that since it treats all boys and girls the same, it does not violate the Equal Protection Clause. This is untrue. Rather, the School District treats transgender students like Ash, who fail to conform to the sex-based stereotypes associated with their assigned sex at birth, differently. These students are disciplined under the School District's bathroom policy if they choose to use a bathroom that conforms to their gender identity. This places the burden on the School District to demonstrate that its justification for its bathroom policy is not only genuine, but also "exceedingly persuasive." *See Virginia*, 518 U.S. at 533. This burden has not been met here.

The School District defends its bathroom policy by claiming it needs to protect the privacy rights of all 22,160 students.[6] The mere presence of a transgender student in the bathroom, the School District argues, infringes upon the privacy rights of other students with whom he or she does not share biological anatomy. While this court certainly recognizes that the School District has a legitimate interest in ensuring bathroom privacy rights are protected, this interest must be weighed against the facts of the case and not just examined in the abstract, to determine whether this justification is genuine.

---

[6] We note that the School District's reliance upon the privacy interests of all of its 22,160 students is odd given that the preliminary injunction order only pertains to Ash, a student at one of its high schools. Many of the School District's students attend schools other than Tremper and are therefore, totally unaffected by the district court's order.

What the record demonstrates here is that the School District's privacy argument is based upon sheer conjecture and abstraction. For nearly six months, Ash used the boys' bathroom while at school and school-sponsored events without incident or complaint from another student. In fact, it was only when *a teacher* witnessed Ash washing his hands in the restroom that his bathroom usage once more became an issue in the School District's eyes. And while at oral argument, the School District asserted that it had received just one complaint from a parent, this is insufficient to support its position that its policy is required to protect the privacy rights of each and every student. Counsel for the School District cited to Ash's Amended Complaint for this assertion. The Amended Complaint, however, states that "some parents and other Kenosha residents began to speak out in opposition to Ash's right to use the boys' restrooms." Am. Comp. ¶ 77. It further states that several community members spoke at a School Board meeting and voiced their opposition to a policy that would allow transgender students to use gender-appropriate restrooms. *See id.* ("One parent told the Board that he was opposed to permitting transgender students to use gender-appropriate restrooms … ."). Nonetheless, neither party has offered any evidence or even alleged that the School District has received any complaints *from other students*. This policy does nothing to protect the privacy rights of each individual student vis-à-vis students who share similar anatomy and it ignores the practical reality of how Ash, as a transgender boy, uses the bathroom: by entering a stall and closing the door.

A transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances at his or her classmates

performing their bodily functions. Or for that matter, any other student who uses the bathroom at the same time. Common sense tells us that the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall. Nothing in the record suggests that the bathrooms at Tremper High School are particularly susceptible to an intrusion upon an individual's privacy. Further, if the School District's concern is that a child will be in the bathroom with another child who does not look anatomically the same, then it would seem that separate bathrooms also would be appropriate for pre-pubescent and post-pubescent children who do not look alike anatomically. But the School District has not drawn this line. Therefore, this court agrees with the district court that the School District's privacy arguments are insufficient to establish an exceedingly persuasive justification for the classification.

Additionally, at oral argument, counsel for the School District clarified that the only way that Ash would be permitted to use the boys' restroom would be if he were to present the school with a birth certificate that designated his sex as male. But it is important to keep in mind that the School District has not provided a written copy of the policy. Nor is it clear that one even exists. And, before this litigation, Ash's mother was never told that she needed to produce a birth certificate. Instead, when she asked the School District to permit him to use the boys' restroom, the school's assistant principal told her that Ash could use the boys' restroom only if his sex was changed in the school's official records. To do so, Ash would need to submit unspecified legal or medical "documentation." Despite explaining to the assistant principal that Ash

was too young to have sex-reassignment surgery and presenting the School District with two letters from Ash's pediatrician, Ash was still not allowed to use the boys' restroom.

Further, it is unclear that the sex marker on a birth certificate can even be used as a true proxy for an individual's biological sex. The marker does not take into account an individual's chromosomal makeup, which is also a key component of one's biological sex. Therefore, one's birth certificate could reflect a male sex, while the individual's chromosomal makeup reflects another. It is also unclear what would happen if an individual is born with the external genitalia of two sexes, or genitalia that is ambiguous in nature. In those cases, it is clear that the marker on the birth certificate would not adequately account for or reflect one's biological sex, which would have to be determined by considering more than what was listed on the paper.

Moreover, while it is true that in Wisconsin an individual may only change his or her designated sex on a birth certificate after completing a surgical reassignment, *see* Wis. Stat. Ann. § 69.15(4), this is not universally the case. For example, as Ash's counsel pointed out during oral argument, in Minnesota, an individual may amend his or her birth certificate to reflect his or her gender identity without surgical reassignment. *See Requirements for documents submitted to support the amendment of a birth record,* MINNESOTA DEP'T OF HEALTH, *http://www.health.state.mn.us/divs/chs/osr/reqdocs.html#gender* (last visited May 30, 2017). Therefore, a student who is born in Minnesota and begins his transition there, obtaining a modified birth certificate as part of the process, could move to Kenosha and be permitted to use the boys' restroom in one of

the School District's schools even though he retains female anatomy.

Additionally, the policy fails to account for the fact that a new student registering with the School District need not even provide a birth certificate. Rather, the School District requires that each new student provide either a birth certificate *or* a passport. *See Registration*, KENOSHA UNIFIED SCH. DIST., *http://www.kusd.edu/registration* (last visited May 30, 2017). Pursuant to the United States Department of State's policies, an individual may apply for and receive a passport that reflects his or her gender identity by presenting a signed medical certification from a physician. *See Gender Designation Change*, U.S. DEP'T OF STATE, https://travel.state.gov/content/passports/en/passports/information/gender.html#change (last visited May 30, 2017). This process does not require that an individual have undergone sex-reassignment surgery. Therefore, the School District's reliance upon a birth certificate's sex-marker demonstrates the arbitrary nature of the policy; so, Ash has met the low threshold of demonstrating a probability of success on his Equal Protection Claim.

### 4. Balance of Harms Favors Ash

Having already determined that the district court did not err in finding that Ash will suffer irreparable harm absent preliminary injunctive relief, we now must look at whether granting preliminary injunctive relief will harm the School District and the public as a whole. Once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must balance the harms faced by both parties and the public as a whole. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549

F.3d 1079, 1100 (7th Cir. 2008); *see also Turnell v. CentiMark Corp.,* 796 F.3d 656, 662 (7th Cir. 2015). This is done on a "sliding scale" measuring the balance of harms against the moving party's likelihood of success. *Turnell,* 796 F.3d at 662. The more likely he is to succeed on the merits, the less the scale must tip in his favor. *Id.* The converse, however, also is true: the less likely he is to win, the more the balance of harms must weigh in his favor for an injunction to issue. *Id.* Substantial deference is given to the district court's analysis of the balancing of harms. *Id.*

The School District argues that the district court erred in determining that the balance of the harms weighed in favor of granting the injunction because it ignored the fact that the harm extends to 22,160 students in the School District whose privacy rights are at risk by allowing a transgender student to utilize a bathroom that does not correspond with his biological sex. Granting the injunction, the School District continues, also irreparably harmed these students' parents, who are now denied the right to direct the education and upbringing of their children. Additionally, the School District asserts that the injunction harms the public as a whole, since it forces other school districts nationwide to contemplate whether they must change their policies and alter their facilities or risk being found out of compliance with Title IX. Noncompliance places their federal funding at risk. Based upon this record, however, we find the School District's arguments unpersuasive.

The School District has not demonstrated that it will suffer any harm from having to comply with the district court's preliminary injunction order. Nor has it established that the public as a whole will suffer harm. As noted above, before seeking

injunctive relief, Ash used the bathroom for nearly six months *without incident*. The School District has not produced any evidence that any students have ever complained about Ash's presence in the boys' restroom. Nor have they demonstrated that Ash's presence has actually caused an invasion of any other student's privacy. And while the School District claims that preliminary injunctive relief infringes upon parents' ability to direct the education of their children, it offers no evidence that a parent has ever asserted this right. These claims are all speculative.

We are further convinced that the district court did not err in finding that this balance weighed in favor of granting the injunction when considering the statements made by *amici*, who are school administrators from twenty-one states and the District of Columbia. Together, these administrators are responsible for educating approximately 1.4 million students. Each administrator has experience implementing inclusive bathroom policies in their respective schools, and each has grappled with the same privacy concerns that the School District raises here. These administrators uniformly agree that the frequently-raised and hypothetical concerns about a policy that permits a student to utilize a bathroom consistent with his or her gender identity have simply not materialized. Rather, in their combined experience, all students' needs are best served when students are treated equally.

Although the School District argues that implementing an inclusive policy will result in the demise of gender-segregated facilities in schools, the *amici* note that this has not been the case. In fact, these administrators have found that allowing transgender students to use facilities that align with their gen-

der identity has actually reinforced the concept of separate facilities for boys and girls. When considering the experience of this group in light of the record here, which is virtually devoid of any complaints or harm caused to the School District, its students, or the public as a whole, it is clear that the district court did not err in balancing the harms.

## III. CONCLUSION

Appellants' motion to have this court assert pendent appellant jurisdiction over the district court's denial of Appellants' Motion to Dismiss is DENIED. The district court's order granting the Appellee's motion for a preliminary injunction is AFFIRMED.