In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-2605

BARBARA TULLY, KATHARINE BLACK, MARC BLACK, DAVID CARTER, REBECCA GAINES, ELIZABETH KMIECIAK, CHAQUITTA MCCLEARY, DAVID SLIVKA, DOMINIC TUMMINELLO, and INDIANA VOTE BY MAIL, INC., individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

PAUL OKESON, S. ANTHONY LONG, SUZANNAH WILSON OVERHOLT, ZACHARY E. KLUTZ, and CONNIE LAWSON, in their official capacities,

*Defendants-Appellees*.

Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. No. 20-cv-01271 — **James Patrick Hanlon**, *Judge*.

ARGUED SEPTEMBER 30, 2020 — DECIDED OCTOBER 6, 2020

Before RIPPLE, KANNE, and SCUDDER, *Circuit Judges*.

KANNE, *Circuit Judge*. Relying on the unprecedented challenges posed by the COVID-19 pandemic, Plaintiffs seek a

preliminary injunction requiring Indiana to permit unlimited absentee voting in the upcoming general election. To attain this goal, they challenge Indiana's absentee-voting regime on two grounds. First, Plaintiffs assert that Indiana's extension of absentee ballots to elderly Hoosiers violates the Twenty-Sixth Amendment by abridging younger Hoosiers' right to vote. Second, Plaintiffs contend that requiring some voters, such as themselves, to cast ballots in person during the ongoing COVID-19 pandemic infringes on their fundamental right to vote and thus violates the Fourteenth Amendment's Equal Protection Clause.

These claims hinge on one question: what is "the right to vote"? In *McDonald v. Board of Election Commissioners of Chicago*, the Supreme Court told us that the fundamental right to vote does not extend to a claimed right to cast an absentee ballot by mail. 394 U.S. 802, 807 (1969). And unless a state's actions make it harder to cast a ballot at all, the right to vote is not at stake. *Id.*

Considering that definition, Indiana's absentee-voting regime does not affect Plaintiffs' right to vote and does not violate the Constitution. In the upcoming election, all Hoosiers, including Plaintiffs, can vote on election day, or during the early-voting period, at polling places all over Indiana. The court recognizes the difficulties that might accompany in-person voting during this time. But Indiana's absentee-voting laws are not to blame. It's the pandemic, not the State, that might affect Plaintiffs' determination to cast a ballot.

Two other principles guide our decision in this case. First, the Constitution explicitly grants states the authority to prescribe the manner of holding federal elections. U.S. Const. art. I, § 4. Recognizing that authority, our court has acknowledged

that balancing the interests of discouraging fraud and mitigating elections-related issues with encouraging voter turnout is a judgment reserved to the legislature. *See Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004). Second, the Supreme Court's *Purcell* principle counsels federal courts to exercise caution and restraint before upending state election regulations on the eve of an election. *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Given that voting is already underway in Indiana, we have crossed *Purcell*'s warning threshold and are wary of turning the State in a new direction at this late stage.

We therefore affirm the district court's decision denying Plaintiffs' request for a preliminary injunction.

## I. BACKGROUND

Indiana voters who fall into any of thirteen statutorily enumerated categories can vote by mail. Ind. Code § 3-11-10-24 (2020). One of those categories encompasses voters aged sixty-five and older. *Id.* § 3-11-10-24(a)(5). Others encompass, for example, disabled or homebound voters, voters who lack transportation, and voters who expect to be absent from the county on election day. *Id.* § 3-11-10-24(a).

For purposes of the primary election held in June of this year, the Indiana Election Commission responded to the difficulties of voting during the COVID-19 pandemic by extending these absentee-voting privileges to all registered and qualified Indiana voters. For the general election coming up this November, however, the IEC did not renew its order. Instead, Indiana has by now taken steps to alleviate COVID-19's burden on voters by, for example, allowing Hoosiers in all counties to vote during a twenty-eight-day period before the election (*see id.* § 3-11-10-26(f)) and by implementing safety

guidelines and procuring protective equipment for election day. This preparation also came as Indiana progressed to "Stage 5" of its public health and reopening plan late last month.[1]

Plaintiffs include nine Indiana voters who do not expect to qualify for an absentee ballot in the fast-approaching general election.[2] Asserting claims under the Twenty-Sixth Amendment and the Equal Protection Clause, they moved for a preliminary injunction requiring Indiana to implement "no-excuse absentee voting" in the general election. The district court denied Plaintiffs' motion. Plaintiffs now appeal that decision.

## II. ANALYSIS

"A preliminary injunction is an extraordinary remedy." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) (citing *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008)). "We review the grant of a preliminary injunction for the abuse of discretion, reviewing legal issues *de novo*, while factual findings are reviewed for clear error." *Id.* (internal citations omitted) (citing *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1057 (7th Cir. 2016); *Fed. Trade Comm'n v. Advoc. Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016)).

---

[1] *See* Shari Rudavsky, *Indiana to Move to Stage 5 of Coronavirus Reopening Saturday While Staying Masked*, Indianapolis Star (Sept. 23, 2020), https://www.indystar.com/story/news/health/2020/09/23/indiana-move-stage-5-coronavirus-reopening/3506866001/.

[2] Although there is a corporate plaintiff—Indiana Vote by Mail, Inc.—for simplicity, we refer only to the individual plaintiffs throughout the opinion.

To merit such relief, a movant "must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). Then, if the movant makes this threshold showing, the court proceeds to consider the balance of harms between the parties and the effect of granting or denying a preliminary injunction on the "public interest." *Id.* This case turns on the threshold inquiry and, more particularly, whether Plaintiffs have shown that they have a reasonable likelihood of success on the merits.

A movant's showing of likelihood of success on the merits must be "strong." *Ill. Republican Party v. Pritzker*, No. 20-2175, 2020 WL 5246656, at *2 (7th Cir. Sept. 3, 2020). "A 'strong' showing … does not mean proof by a preponderance … . But it normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* Plaintiffs have not made this "strong" showing as to either of their claims because "the right to vote" does not include Plaintiffs' "claimed right to receive absentee ballots." *McDonald v. Bd. of Election Comm'rs of Chi.* 394 U.S. 802, 807 (1969).

*A. Plaintiffs' Twenty-Sixth Amendment Claim*

The Twenty-Sixth Amendment provides, "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." Plaintiffs argue that Indiana's law permitting Hoosiers who are sixty-five and older to vote absentee violates the Twenty-Sixth Amendment because it does not provide the same privilege to younger voters. The success of this claim depends on whether Indiana's

age-based absentee-voting law abridges "the right … to vote" protected by the Twenty Sixth Amendment or merely affects a privilege to vote by mail.

The Supreme Court answered this question in *McDonald*. 394 U.S. at 807; *see also Tex. Democratic Party v. Abbott*, No. 20-50407, 2020 WL 5422917, at *10 (5th Cir. Sept. 10, 2020) ("Understanding what the right to vote meant at the time the Twenty-Sixth Amendment was ratified in 1971 is certainly assisted by the 1969 *McDonald* decision."). There, pretrial detainees in Illinois argued that a state law granting absentee ballots to some individuals, but not to pretrial detainees, violated the Equal Protection Clause. *McDonald*, 394 U.S. at 803. The Court rejected this argument because the detainees did not put forth evidence showing that the challenged law "impact[ed their] ability to exercise the fundamental right to vote" or that it "absolutely prohibited" them from voting. *Id.* at 807, 808 n.7. Instead, the law "ma[de] voting more available to some groups." *Id.* at 807. Therefore, it was "not the right to vote that [was] at stake … but a claimed right to receive absentee ballots." *Id.* In short, the Court held that the fundamental right to vote means the ability to cast a ballot, but not the right to do so in a voter's preferred manner, such as by mail.[3]

---

[3] The Court has reiterated this holding several times. *See Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 n.6 (1969) ("In *McDonald* … we were reviewing a statute which made casting a ballot easier for some … . [A]t issue was not a claimed right to vote but a claimed right to an absentee ballot."); *see also Hill v. Stone*, 421 U.S. 289, 300 n.9 (1975) (summarizing *McDonald* as addressing "whether pretrial detainees in Illinois jails were unconstitutionally denied absentee ballots" when "there was nothing in the record to indicate that the challenged Illinois statute had any impact on the appellants' exercise of their right to vote"); *Goosby v. Osser*, 409 U.S. 512, 521 (1973) (holding that, unlike the claim in *McDonald*, the plaintiffs'

In this case, we too are reviewing an absentee-voting statute that "make[s] voting more available to some groups"—namely, voters over sixty-five. *Id.*; *see also Luft v. Evers*, 963 F.3d 665, 672 (7th Cir. 2020) (noting that Wisconsin's absentee-voting laws "make voting easier"). And even as applied right now, during a pandemic, the *statute* does not "impact[ Plaintiffs'] ability to exercise the fundamental right to vote" or "absolutely prohibit[ Plaintiffs] from voting"; only the pandemic is potentially guilty of those charges. *McDonald*, 394 U.S. at 807, 808 n.7.

If Indiana's law granting absentee ballots to elderly voters changed or even disappeared tomorrow, all Hoosiers could vote in person this November, or during Indiana's twenty-eight-day early voting window, just the same. Consequently, "at issue [i]s not a claimed right to vote" but a "claimed right to an absentee ballot." *Id.* at 807. And for that reason, Plaintiffs' claim under the Twenty-Sixth Amendment, which only protects the right to vote, is unlikely to succeed. *Abbott*, 2020 WL 5422917, at *15 ("[A]n election law abridges a person's right to vote for the purposes of the Twenty-Sixth Amendment only if it makes voting more difficult.").

---

claim implicated the right to vote because it alleged that a "Pennsylvania statutory scheme absolutely prohibit[ed] the[ plaintiffs] from voting"); *Bullock v. Carter*, 405 U.S. 134, 143 (1972) ("Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." (citing *McDonald*, 394 U.S. at 802)). And other federal courts of appeals have continued to acknowledge *McDonald*'s authority. *See, e.g.*, *Abbott*, 2020 WL 5422917, at *12 (relying on *McDonald* to hold that "the right to vote in 1971 did not include a right to vote by mail" and that "[i]n-person voting was the rule, absentee voting the exception"); *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020) ("[T]here is no constitutional right to an absentee ballot." (citing *McDonald*, 394 U.S. at 807–09)).

Plaintiffs retort that this conclusion is wrong because hypothetical laws similarly restricting the ability of African Americans or women or the poor to vote by mail would violate the Fifteenth, Nineteenth, and Twenty-Fourth Amendments, respectively.[4] Plaintiffs are correct that such laws could be subject to heightened scrutiny for "operat[ing] to the peculiar disadvantage of a suspect class." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). But this scrutiny would come from the Fourteenth Amendment's Equal Protection Clause. *Am. Party of Tex. v. White*, 415 U.S. 767, 795 (1974) ("[P]ermitting absentee voting by some classes of voters and denying the privilege to other classes … is an arbitrary discrimination violative of the *Equal Protection Clause*." (emphasis added)); *McDonald*, 394 U.S. at 807 ("[A] careful examination on our part is especially warranted [under the Equal Protection Clause] where lines are drawn on the basis of wealth or race … ."). It would *not* come from the Fifteenth, Nineteenth, or Twenty-Fourth Amendments because Plaintiffs' hypothetical laws do not implicate the right to vote.[5] Plaintiffs' rebuttal thus bears no weight.

---

[4] U.S. Const. amend. XV ("The right of citizens of the United States to vote shall not be denied or abridged … on account of race … ."); *id.* amend. XIX ("The right of citizens of the United States to vote shall not be denied or abridged … on account of sex."); *id.* amend. XXIV ("The right of citizens of the United States to vote … shall not be denied or abridged … by reason of failure to pay any poll tax or other tax.").

[5] Plaintiffs have not argued that Indiana's age-based absentee-voting law violates the Equal Protection Clause by "operat[ing] to the peculiar disadvantage of a suspect class." *Murgia*, 427 U.S. at 312. So we do not reach that issue.

*B. Plaintiffs' Equal Protection Claim*

The Fourteenth Amendment's Equal Protection Clause prohibits states from impermissibly interfering with individuals' fundamental rights such as the right to vote. *Murgia*, 427 U.S. at 312 & n.3. Plaintiffs argue that Indiana's absentee-voting regime requiring some Indiana voters, themselves included, to cast ballots in person during the COVID-19 pandemic hinders their ability to vote and therefore violates the Equal Protection Clause. We disagree. Because Indiana's absentee-voting scheme does not impact Plaintiffs' fundamental right to vote, *McDonald* commands that rational-basis review applies. And under that lenient test, Plaintiffs' equal protection claim is not likely to succeed. Further, whether we employ *McDonald*'s rational-basis test or the *Anderson/Burdick* balancing-of-interests test, we land on the same conclusion.

*1. Rational-basis review applies.*

The parties disagree on the appropriate test to use in scrutinizing Indiana's absentee-voting regime under the Equal Protection Clause. Plaintiffs argue that we should apply the balancing test set forth by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), under which we weigh the burden that a state regulation imposes on the right to vote against the state's interest in enacting the regulation. But Indiana argues that we should apply the rational-basis test used by the Supreme Court in *McDonald*, 394 U.S. at 807–08.

The Supreme Court has never overturned or disparaged any of these cases. In fact, *Burdick* itself cites *McDonald* favorably. *Burdick*, 504 U.S. at 434. So, bearing in mind that the Supreme Court shies from overturning its precedents *sub*

*silentio*, *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000), we must harmonize the *McDonald* and *Anderson*/*Burdick* frameworks.

As explained above, *McDonald* dealt with Illinois pretrial detainees who brought an equal protection challenge against a law that did not affect their fundamental "right to vote" but only affected "a claimed right to receive absentee ballots." 394 U.S. at 807. The law was thus subject to mere rational-basis review. *Id.* *Anderson* and *Burdick*, however, involved very different situations in which the right to vote protected by the Fourteenth Amendment *was* at stake. *Anderson*, 460 U.S. at 786; *Burdick*, 504 U.S. at 439. The Court therefore employed a balancing test in which it weighed "'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

We have stated that the *Anderson*/*Burdick* "test applies to *all* First and Fourteenth Amendment challenges to state election laws." *Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019). But that assertion, which comes from a case that had nothing to do with absentee voting, did not, and cannot, override the Supreme Court's holding in *McDonald* that rational-basis scrutiny applies to election laws that do not impact the right to vote—that is, the right to cast a ballot in person. *See Bullock v. Carter*, 405 U.S. 134, 143 (1972) ("Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." (citing *McDonald*, 394 U.S. at 802 (1969)). Accordingly, all election laws affecting the right to vote are subject to the

*Anderson/Burdick* test, but election laws that do not curtail the right to vote need only pass rational-basis scrutiny.[6]

Given this harmonization, *McDonald*'s rational-basis test applies in this case to determine the validity of Indiana's absentee-voting scheme under the Equal Protection Clause. Just as Indiana's law providing absentee ballots to elderly Hoosiers does not affect Plaintiffs' right to vote, Indiana's *whole* absentee-voting scheme does not affect Plaintiffs' right to vote. Indiana's absentee-voting laws "ma[ke] casting a ballot easier for" voters who fall into any of thirteen qualifying categories. *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 n.6 (1969) (citing *McDonald*, 394 U.S. at 807). And they do not make it harder for anyone to cast a ballot—it's COVID-19 that might affect election-day plans. For those reasons, rational-basis review controls.

*2. Indiana's absentee-voting laws pass rational-basis review.*

Under rational-basis review, a law must "bear some rational relationship to a legitimate state end." *McDonald*, 394 U.S. at 809. This poses a low hurdle because rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Johnson v. Daley*, 339 F.3d 582, 587 (7th Cir. 2003) (quoting *Heller v. Doe*, 509 U.S. 312, 319

---

[6] We also note that *Anderson* and *Burdick* themselves compel this conclusion. The balancing test set forth by those cases requires courts to consider "the character and magnitude of the asserted injury to *the rights protected by the First and Fourteenth Amendments* that the plaintiff seeks to vindicate." *Burdick*, 504 U.S. at 434 (emphasis added) (quoting *Anderson*, 460 U.S. at 789). As has been exhaustively explained, the ability to vote by mail is not a "right[] protected by the First and Fourteenth Amendments." *Id.* So, in cases like *McDonald*, where only the claimed right to vote by mail is at issue, the *Anderson/Burdick* test, by its own terms, cannot apply.

(1993)). For example, in *McDonald*, the Court held that the Illinois law failing to provide absentee ballots to pretrial detainees passed rational-basis review because, although Illinois could make voting easier "by extending absentee voting privileges to [the detainees, i]ts failure to do so … hardly seems arbitrary, particularly in view of the many other classes of Illinois citizens not covered by the absentee provisions, for whom voting may be extremely difficult, if not practically impossible." 394 U.S. at 809–10.

Indiana's absentee-voting scheme likewise survives rational-basis scrutiny. In wielding its "broad authority to regulate the conduct of elections, including federal ones," Indiana has an undeniably legitimate interest in preventing voter fraud and "other abuses" that are "facilitated by absentee voting." *Griffin v. Roupas*, 385 F.3d 1128, 1130–31 (7th Cir. 2004). And the Indiana General Assembly's decision to open up absentee voting only to those Hoosiers who are most likely to benefit from it bears a clearly rational relationship to that interest in curbing the dangers of unfettered absentee voting. *Id.* So although Indiana could make voting even easier "by extending absentee-voting privileges to" all, "[i]ts failure to do so … hardly seems arbitrary." *McDonald*, 394 U.S. at 810.

*3. Indiana's voting scheme is equally sound even under the* Anderson/Burdick *test.*

Even if we were to analyze Plaintiffs' equal protection challenge using the *Anderson/Burdick* balancing approach, we would arrive at the same result. The Supreme Court in *Burdick* acknowledged the fundamental nature of the right to vote but recognized that it does not follow "that the right to vote in any manner … [is] absolute." *Burdick*, 504 U.S. at 433. State laws regulating the mechanics of elections will "invariably impose

some burden upon individual voters," so courts should employ a balancing analysis for constitutional challenges to such laws. *Id.* at 433–34. Specifically, courts "weigh 'the character and magnitude of the asserted injury'" to voting rights "against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Id.* at 434 (quoting *Anderson*, 460 U.S. at 789). *Anderson* further instructs that, in undertaking this balancing inquiry, we "must not only determine the legitimacy and strength of each of those interests" but also "consider the extent to which those interests make it necessary to burden the plaintiff's rights." 460 U.S. at 789.

Plaintiffs assert that their inability to vote by mail under Indiana's absentee-voting laws force each voter to make a choice between personal health and safety and exercising the right to vote. There is no question that Indiana's eligibility requirements for absentee voting inconvenience some voters who would prefer, but do not qualify, to vote by mail. But we cannot assess Indiana's absentee voting provisions in isolation and instead must consider Indiana's electoral scheme as a whole. *See Burdick*, 504 U.S. at 434–37; *Luft*, 963 F.3d at 671–72, 675.

Indiana allows absentee voting by mail for all Hoosiers that qualify in one of thirteen categories, which include voters who are disabled, will be confined due to illness or injury, will be confined caring for another person, lack transportation to the polls, are age sixty-five or older, expect to be absent from the county on election day, and more. Ind. Code § 3-11-10-24. Indiana also allows for early in-person voting for twenty-eight days leading up to the election, one of the longer early-voting periods across all states. *Id*. § 3-11-10-26(f).

What is more, the Indiana Governor's Stay-At-Home Executive Order has expired and Indiana has progressed to "Stage 5" of its reopening plan, alleviating some of Plaintiffs' proposed justifications for universal voting by mail. Taken together, the State's voting scheme has a modest impact on Hoosiers in selecting their preferred manner of voting, but we cannot say it severely restricts the right to vote altogether.

Turning to the state-interest side of the balancing scale, Indiana has identified several factors that guided its decision to allow some, but not all, Hoosiers to vote absentee: discouraging fraud, ensuring that the maximum number of ballots are deemed valid, managing administrative capacity to process ballots, and permitting voters to receive timely information about candidates up to election day.

On balance, Indiana's legitimate interests in ensuring safe and accurate voting procedures are sufficient to outweigh any limited burden on Hoosiers' right to vote as they choose caused by the State's restricted absentee voting scheme. We are mindful that Indiana's decision to accommodate some voters by permitting absentee voting "is an indulgence—not a constitutional imperative that falls short of what is required." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J., concurring). And we reiterate that "[o]ne less-convenient feature does not an unconstitutional system make." *Luft*, 963 F.3d at 675.

Finally, we are well aware that the most severe public-health crisis of the past century currently ravages our nation and the world. But that reality does not undermine our conclusion—it reinforces it. "[T]he balance between discouraging fraud and other abuses," on the one hand, and "encouraging turnout" and voter safety, on the other, "is quintessentially a

legislative judgment." *Griffin*, 385 F.3d at 1131. This court is ill equipped to second guess, let alone override, the rational policy judgments of Indiana's elected officials "on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). Indeed, "[g]iven the imminence of the election," our intervention now would only risk exacerbating "voter confusion," and we should therefore "allow the election to proceed without an injunction." *Purcell v. Gonzalez*, 549 U.S. 1, 4–6 (2006). This holds true even—and especially—in midst of a pandemic when "[l]ocal officials are working tirelessly to 'shap[e] their response to changing facts on the ground,' knowing that the appropriate response is 'subject to reasonable disagreement.'" *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 393–94 (5th Cir. 2020) (alteration in original) (quoting *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring)).

Indiana has exercised its judgment and taken steps to lighten COVID-19's burden on voters by, for example, allowing Hoosiers to vote early and implementing safety guidelines and procuring protective equipment for election day. *Tully v. Okeson*, No. 1:20-cv-01271-JPH-DLP, 2020 WL 4926439, at *6 (S.D. Ind. Aug. 21, 2020). We cannot upend this legislative work even if we thought we could do better. *Griffin*, 385 F.3d at 1132.

### III. CONCLUSION

We are mindful of the difficulties that so many Hoosiers, and other Americans, face as a result of COVID-19. We also fully grasp the gravity of our national elections and the sincere desires of Plaintiffs and other Hoosiers to participate in one of the most central aspects of our republic—choosing our representatives. But it is precisely because of the gravity of

this situation that we should not, and will not, "judicially leg-
islat[e] so radical a reform [as unlimited absentee voting] in
the name of the Constitution" where the State has infringed
on no one's right to vote. *Griffin*, 385 F.3d at 1130. We therefore
AFFIRM the decision of the district court.

RIPPLE, *Circuit Judge*, concurring. I join the judgment of the court affirming the district court's denial of a preliminary injunction.

The Indiana statutory scheme for voting by absentee ballot is a generous one. It sets forth thirteen categories of individuals who can vote absentee. Ind. Code § 3-11-10-24 (2020). It also gives the Indiana Election Commission the authority to let any "person who is otherwise qualified to vote in person to vote by absentee ballot" in an emergency. *Id.* § 3-11-4-1(c). One of the categories listed in the statute is the elderly, *id.* § 3-11-10-24(a)(5), defined in another section of the Code as those over sixty-five years old. *Id.* § 3-5-2-16.5. The remaining sections deal with other categories of individuals who may be impeded in getting to the polls. Unlike in this year's primary elections, the Commission has refrained from extending permission, under its emergency powers, to all otherwise qualified voters to vote by absentee ballot in the general election. Notably, it still has the authority to consider individual cases. *Id.* § 3-11-4-1(c).

In my view, the plaintiffs have made a weak case that the Commission's action constitutes an abridgement of the right to vote on the basis of age and therefore violates the Twenty-Sixth Amendment. The statute granting the mail ballot privilege employs age only in a tangential way. It simply defines the term "elderly" as a person who has lived sixty-five years. This definitional shorthand is a common-sense tool; it relieves the Commission of the insurmountable task of adjudicating, on an individual basis, which of its older citizens would be deterred in coming to the polls on a November day because of the physical and social conditions that invariably afflict senior citizens. A November day in Indiana, at

least in the northern regions of the State, can pose a significant obstacle to leaving one's home.

By granting a general absentee voting privilege to its senior citizens, the State removed for its senior citizens impediments not experienced by most other Hoosiers who desire to vote. By defining the elderly by age, the State may well have created a category that is both over- and under-inclusive. No party in this case suggests, however, that this line drawing constitutes an invidious irrebuttable presumption. To the extent that the category is over-inclusive, it simply implements the legislature's solicitude that everyone who experiences the barriers associated with old age can vote. Any under inclusion is the unhappy byproduct of the need to make a reasonable judgment based on the Country's general experience in dealing with the problems of the aged. The legislature simply employed a reasonable methodology to identify those who, in its judgment, needed a special accommodation to get to the polls. This is hardly an invidious classification based on age.

My colleagues do not concern themselves with the nature of the State's exemption for the aged because, in their view, *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), establishes a rigid rule that the fundamental right to vote does not include a right to cast an absentee ballot. Any age distinction with respect to absentee ballot privileges therefore does not impact the right to vote and therefore does not implicate the Twenty-Sixth Amendment. *McDonald* antedates the ratification of this Amendment, however, and it may well be that the day will come when the general rule articulated in *McDonald* will have to yield to the Twenty-Sixth Amendment when the values protected by

that Amendment are clearly at stake. As I already have explained, I do not believe that those values are directly implicated here. We live, however, in an age when many consider manipulation of the electoral process to be acceptable public conduct. We well may see someday a more direct attempt to manipulate the electoral process by altering the absentee ballot program to disfavor a specific age group. On that issue, we ought to keep our powder dry.[1]

The plaintiffs' Fourteenth Amendment argument, while somewhat stronger than their Twenty-Sixth Amendment submission, hardly constitutes a significant chance of success on the merits. Here, the intermediate scrutiny of the *Anderson-Burdick* rule seems appropriate to ensure that manipulation of the absentee ballot privilege does not result in disenfranchisement. Yet, invocation of this intermediate scrutiny test does not appreciably assist the plaintiffs here. On this record, they simply cannot show any realistic jeopardy of losing the right to vote because of the Commission's decision not to extend the absentee ballot privilege. The record shows

---

[1] The same may very well be said for my colleagues' discussion of the Fifteenth, Nineteenth, and Twenty-Fourth Amendments. My colleagues write that only the Fourteenth Amendment offers a vehicle to scrutinize line drawing on the basis of race or sex or wealth, with respect to absentee voting—the Fifteenth, Nineteenth, and Twenty-Fourth Amendments, according to my colleagues, have no role to play on the issue. This case, of course, does not present us with an opportunity to consider how the Fifteenth, Nineteenth, or Twenty-Fourth Amendments might apply to laws regarding absentee voting, or how the historical context underlying those Amendments might differentiate each Amendment's scope. Though my colleagues' discussion of the Fifteenth, Nineteenth, and Twenty-Fourth Amendments is surely dicta, I believe it is prudent to keep our powder dry on those issues as well.

that the Commission assessed the State's capacity to conduct a "no excuses" absentee ballot election and compared it to its ability to conduct an in-person election with enhanced safeguards for the health of the voters. The Commission considered the significant difficulty that it had experienced in conducting the primary election under a "no excuses" absentee ballot system. Although the primaries required the State to handle a significantly smaller number of ballots than the number anticipated in the general election, the State's capacity to tally the votes was significantly wanting.[2] There is no indication in the record that, in the short period since the primary election, the State has had the opportunity to build the infrastructure necessary to handle a significantly greater number of ballots in the general election. On the other hand, the record does demonstrate that the State has taken significant alternate steps to assuage the danger still attendant on waiting in an enclosed area to vote.[3] Whether the State made a wise decision we cannot say. That it made its decision only after a careful weighing of the competing considerations is evident. *See Burdick v. Takushi*, 504 U.S. 428, 438–39 (1992). Further judicial scrutiny of that decision is not appropriate. Accordingly, I join the judgment of the court.

---

[2] R.53, Exs. 1–4.

[3] R.53, Ex. 4.